**Harold Loyd LONG, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 50164.**

Court of Criminal Appeals of Texas.

Dec. 10, 1975.

Rehearing Denied Jan. 21, 1976.

George E. Milner, Jr., Lawrence B. Mitchell, Dallas, for appellant.

Jerry W. Woodlock, Dist. Atty., Gainesville, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

BROWN, Commissioner.

This is an appeal from a conviction for possession of marihuana. The jury assessed punishment at ten years' imprisonment and a fine of five thousand dollars.

Appellant initially contends that the evidence is insufficient to support the conviction. The facts will therefore be set forth in some detail.

Eldon D. Moyers, the Sheriff of Wise County, testified that he had received reports on two prior occasions of aircraft circling and landing in a rural section of Wise County near what was described as the "Spann place." Approximately two weeks before the appellant was arrested, the Sheriff again received a report of aircraft circling and landing in the same area. The Sheriff proceeded to a point where he could observe the area. He testified that the time was about 11:45 p. m. and he saw one aircraft take off while another aircraft circled overhead. The departing aircraft only used its landing lights for a very brief period to allow it to clear the ground. The runway lights were also on only during the aircraft's take-off and then were turned off. At this point, the circling aircraft turned toward Decatur and was followed by the aircraft that had just taken off.

Sheriff Moyers further testified that about two weeks after his observations he and a deputy decided to visit the airstrip site to conduct further investigation. The Sheriff stated that he did not know who lived on the property, but that the name on the mailbox was Spann. The Sheriff and his deputy arrived at about 5:00 p. m., parked in the driveway, and went to the

door of the house intending to inquire about the aircraft flights. The Sheriff knocked on the door facing the carport and received no answer. The Sheriff and the deputy then walked to the back door of the house and knocked. Again they received no answer. The Sheriff testified that at this point he said to the deputy, "Well, we'll have to come back later." They continued around the house intending to return to their car.

Sheriff Moyers testified that as they came around the west side of the house they felt a blast of heat and a strong smell coming from an open window. The smell was described as that of freshly cut marihuana. The blinds on the window were also open and when they looked into the room they saw something covering the floor and stacked around the walls. In the doorway they saw an electric heater with an electric floor fan behind it. The Sheriff stated that at this point he and the deputy returned to Decatur to obtain a search warrant.

After a search warrant was obtained, the Sheriff called the Department of Public Safety and received the assistance of several DPS narcotics agents. They returned to the property in question and set up surveillance.

Dale Hampton, a Department of Public Safety narcotics agent, testified that during the surveillance of the property he saw the appellant drive up to the residence, take some keys from his pocket, unlock the back door and enter the house. Appellant was in the house for a short period of time. A car then drove into the front yard, appellant came out of the house, locked the door, and spoke with the man in the car for several minutes. Appellant was then observed returning to the house. A short time later the appellant was observed coming back out of the house. He then drove his car out into the barnyard and hooked a two-wheel trailer to the car. Appellant then drove the car and trailer back into the yard near the house. The appellant then made several trips between the house and the trailer. The appellant was then observed to stand up in the trailer and shake out something that appeared to be a blanket or small tarp, cover the trailer with this, and tie it down. A few minutes later the appellant left the property in his car and returned a few minutes later, reentered the house, returned to the car and left again. Appellant returned to the property later in the evening with a female companion. Later still, another man and woman with a small child arrived at the house. Agent Hampton further testified that he continued to conduct surveillance of the property through the hours of darkness with the aid of a night vision scope. There was an old school bus parked in the yard of the farmstead which had apparently been converted into a camper. At about 11:20 p. m., the bus was moved around in the yard. The appellant, together with the others present, was observed making numerous trips from the house to the bus and back. This activity continued until about 3:30 a. m., when the lights in the house were turned off and all activity ceased. The surveillance continued throughout the night.

The search warrant which had been obtained on the 9th of October, 1973, was executed at approximately 7:00 a. m. on the morning of October 11, 1973, the morning after the observations testified to by Agent Hampton. When the Sheriff and the DPS agents entered the house, they found the appellant and his female companion in the east bedroom. In the front room of the house they found another couple and a small child. The small child was the only member of the household that was dressed. Agent Hampton described the house as "a mess." "There was stuff scattered everywhere." Marihuana was found under the dinette table and on the top of the dinette table. In the northwest bedroom the agents found marihuana all over the floor and stacked against the wall. There was no furniture in that room. In the doorway to the room with the large quantity of marihuana there were two electric heaters with a large floor fan behind them; all were

running at the time, apparently for the purpose of drying the marihuana.

After making the discoveries described above, the agents proceeded to search the bus which was located within thirty or thirty-five feet of the house. In the bus the agents found what appeared to be marihuana spread out on the bunks that had been built into the bus. Next, the agents searched the two-wheel trailer, which was located approximately two hundred and fifty feet from the house. In the trailer the agents found the bottom covered with about twelve to sixteen inches of what was later shown to be marihuana.

Sheriff Moyers testified that during the search the party discovered three hundred and fifty-five pounds of what was shown to be marihuana. A qualified chemist testified that the substance found at the property was in fact marihuana.

■ Possession of marihuana need not be exclusive and evidence which shows that the appellant jointly possessed the marihuana with another is sufficient. *Williams v. State,* 524 S.W.2d 705 (Tex.Cr.App.1975); *Curtis v. State,* 519 S.W.2d 883 (Tex.Cr. App.1975). Mere presence at a place where narcotics or dangerous drugs are possessed does not in itself justify a finding of joint possession. *Curtis v. State,* supra; *Valdez v. State,* 481 S.W.2d 904 (Tex.Cr.App.1972). The evidence must affirmatively link the appellant to the contraband in such a manner that a reasonable inference arises that the accused knew of its existence. *Hineline v. State,* 502 S.W.2d 703 (Tex.Cr.App.1973); *Williams v. State,* supra. Where the accused is not in the exclusive possession of the premises, it cannot be concluded that he had knowledge of the contraband and control of it unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband. *Barnes v. State,* 504 S.W.2d 450 (Tex.Cr.App.1974); *Wright v. State,* 500 S.W.2d 170 (Tex.Cr.App.1973); *Williams v. State,* 498 S.W.2d 340 (Tex.Cr.App.1973).

■ In this case, the evidence indicates that the appellant had a key to the house. He was observed entering and leaving the house on several occasions, locking and unlocking the door each time as he did so. He was observed entering and leaving the bus the night before the search. He was observed moving the two-wheel trailer and taking it off the property and bringing it back later. The record reflects that the property was under surveillance during the period in question and that no other party had control of the house or vehicles after they left the control of the appellant.

The evidence supports the verdict of the jury.

Appellant's second ground of error is that the trial court erred in overruling his motion to suppress. It is the appellant's contention that the search warrant was issued as the result of a prior warrantless search. Appellant contends that the first warrantless search was illegal and that the subsequent search warrant, and the fruits thereof, were fatally tainted. We disagree. The record in this case shows that in fact no search was conducted.

■ The Fourth Amendment protects people and not places. What a person knowingly exposes to the public, even in his own home or office, is not subject to Fourth Amendment protection. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576; *Turner v. State,* 499 S.W.2d 182 (Tex.Cr.App.1973). A search means, of necessity, a quest for, a looking for, or a seeking out of that which offends against the law. This implies a prying into hidden places for that which is concealed. It is simply not a search to observe that which is open to view. *Turner v. State,* supra; *Crowell v. State,* 147 Tex.Cr.R. 299, 180 S.W.2d 343 (1944).

■ The testimony shows that the Sheriff had received reports of aircraft landing and departing at unusual hours. The Sheriff himself observed the departure of an aircraft from the property under what can only be described as unusual circumstances.

It was altogether proper that the Sheriff should at least make inquiries. The property was in a rural portion of Wise County that was sparsely settled. The Sheriff drove to the property and tried to make inquiries. The rest is stated in some detail above. It should be further noted that a photo of the house is included in the record and it is a very small frame house with a carport attached, and it does not seem at all unreasonable for the Sheriff and his deputy to have continued around the structure after receiving no answer at the rear door. The windows were open and so were the blinds. The Sheriff testified that he felt the heat and smelled the drying marihuana.

Appellant relies on the case of *Texas v. Gonzales*, 388 F.2d 145 (5th Cir., 1968) for his contention that the Sheriff was conducting an illegal search by looking through the window. The facts are distinguishable. In *Gonzales*, the officers made three trips to the window from a hiding place nearby hoping to see some narcotics. On the third trip to the window the officer stood on a drain pipe to see into the window. In *Gonzales*, the window was closed and the blinds were closed. This should be contrasted with *Gil v. Beto*, 440 F.2d 666 (5th Cir., 1971), where the Fifth Circuit denied habeas corpus relief. In the same case on initial appeal [*Gil v. State*, 394 S.W.2d 810 (Tex.Cr. App.1965)], this Court held the rule to be that when one is so foolish as to leave his window open he may not complain if another observes illegal activity.

In *Johnson v. State*, 469 S.W.2d 581 (Tex. Cr.App.1971), officers went to the defendant's apartment, knocked on the door and, when no one answered, looked through a window whose draperies were open and observed stolen merchandise. This Court held that looking through the window was not an illegal search, saying:

"Under this set of facts, we cannot say that appellants could 'reasonably assume that they were free from uninvited inspection through the window' and we must hold that no search protected by the Fourth Amendment occurred."

Sheriff Moyers was investigating suspicious circumstances when he observed the marihuana. He then had probable cause to search and commendably sought to obtain a search warrant. As this Court stated in *Turner v. State*, 499 S.W.2d 182:

"(I)t is the duty of a policeman to investigate, and we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement the Fourth Amendment itself draws the blinds the occupant could have drawn but did not."

Appellant's second ground of error is overruled.

■ Appellant's third and fourth grounds of error will be discussed together as they both relate to the scope of the search authorized by the warrant. Ground of error three relates to the search of the school bus, while ground of error four relates to the search of the two-wheel trailer. It should be remembered that the appellant was charged with the possession of over four ounces of marihuana and the record reflects that significantly more than four ounces were found within the house.

The search warrant commanded the Sheriff to "enter the suspected place described in said Affidavit and to there search." The "suspected place" was described in the warrant as follows:

"Approximately 2.5–3 miles West of State Highway 114, as it goes North from Chico, Texas, on FM 2265, going West from said highway intersection, a white frame house with gray trim; a yellow and black school bus having the name of Schulenburg (See attached exhibit # 1)

EXHIBIT # 1 .

Independent School District, partly blocked out, said school bus now having pink curtains on the windows. The mailbox at said house bears the name 'Spann'. The location lies just Easterly, approximately 2–3 hundred yards of a house and property belonging to W. D. Martin."

The authorities cited by the appellant are not directly in point. Certainly if the war-

rant in this case had contained the phrase "including all other structures, vehicles, and places on the premises," appellant's third and fourth grounds of error would be clearly without merit. However, the warrant before us contains no such phrase.

Clearly the "suspected place" was the farmstead, not simply the house as the appellant contends. After finding contraband in the house, we cannot say that the search of the bus located only a few yards from the house was unreasonable. The bus had been moved the night before the search warrant was executed and the appellant had been seen in and around the bus. Only after more contraband had been found in the bus was the scope of the search widened to the trailer which was located some 250 feet from the house and was within the curtilage of the farmstead.

The test to be applied in searches without a warrant or beyond the scope of a search warrant is whether the search was unreasonable since only unreasonable searches are prohibited by the Fourth Amendment. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. What is reasonable cannot be determined by a rigidly fixed formula. *United States v. Rabinowitz,* 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. Nor can the test be stated in rigid and absolute terms. *Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. In short, what is reasonable within the meaning of the Fourth Amendment depends on the facts and circumstances of each case. *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730; *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (Harlan, J., concurring).

Under the facts and circumstances of this case, the search was not unreasonably broad in its scope. Therefore, the appellant's third and fourth grounds of error are overruled.

The judgment is affirmed.

Opinion approved by the Court.